[Cite as *17AP-466 and 17AP-467*, 2018-Ohio-2413.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | No. 17AP-466 |
| M.H., a.k.a. Mc.H., | | (C.P.C. No. 14JU-14887) |
| | : | |
| (M.H., Sr., | | (REGULAR CALENDAR) |
| Appellant). | : | |
| | | and |
| In the Matter of: | : | |
| M.H., a.k.a. Mk.H. et al., | | No. 17AP-467 |
| | : | (C.P.C. No. 14JU-14815) |
| (M.H., Sr., | | |
| Appellant). | : | (REGULAR CALENDAR) |

D E C I S I O N

Rendered on June 21, 2018

**On brief:** *Yeura R. Venters*, Public Defender, and *George M. Schumann*, for appellant.

**On brief:** *Robert J. McClaren*, for appellee Franklin County Children Services.

APPEALS from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

BRUNNER, J.

{¶ 1} Appellant, M.H., Sr. (hereinafter "M.H."), appeals two judgments entered by the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, on June 2, 2017 in case Nos. 14JU-14815 and 14JU-14887 granting permanent custody of his[1] three biological children ("Mk.H.,[2]" "D.H.," and "Mc.H.") to Franklin County Children Services ("FCCS"). We overrule M.H.'s sole assignment of error and affirm

---

[1] M.H. is stated to be the biological parent of all three children. However, while he legally established parentage over two of the children, Mk.H. and D.H., he only alleged parentage with regard to Mc.H. *See* FCCS Ex. Nos. 25-27, 30-31, Apr. 20, 2017 Hearing. Yet, he contested FCCS' permanent custody motion as to all three.

[2] Mk.H. and Mc.H. have identical initials. We thus distinguish them with additional letters attached to their initials; hence, Mk.H. and Mc.H.

the judgments of the trial court, finding that M.H.'s trial counsel rendered constitutionally effective assistance of counsel.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}  Two complaints were filed on November 12, 2014, one concerning Mk.H. (born 2007) and D.H. (born 2009), (case No. 14JU-14815) and the other concerning Mc.H. (born 2010), (case No. 14JU-14887).  (Nov. 12, 2014 Compl. 14JU-14815; Nov. 12, 2014 Compl. 14JU-14887.)  FCCS alleged in its first complaint that Mk.H. and D.H. were dependent children.  (Nov. 12, 2014 Compl. 14JU-14815.)  FCCS alleged in its second complaint that Mc.H. was abused, neglected, and dependent.  (Nov. 12, 2014 Compl. 14JU-14887.)  Both complaints contained descriptions of abuse and psychological problems alleged to have been inflicted on the children by their mother, and each complaint indicated the location of their father, M.H., to be unknown.  (Compl. 14JU-14815 at 1; Compl. 14JU-14887 at 1.)  Two days after FCCS filed the complaints, the trial court awarded temporary custody of the children to FCCS.  (Nov. 14, 2014 T.C. Order 14JU-14815 at 3; Nov. 14, 2014 T.C. Order 14JU-14887 at 3.)

{¶ 3}  Several months thereafter, in January and February 2015, the trial court held two hearings.  At the first of these, on January 15, 2015, the children's mother appeared but did not contest the abuse and dependency allegations.  (Jan. 15, 2015 Hearing Tr. at 3-4, filed Oct. 30, 2017.)  The trial court issued two orders following the hearing and, on January 29, 2015, adjudicated Mc.H. to be "an abused minor," and Mk.H. and D.H. to be "dependent minors."  (Jan. 29, 2015 Jgmt. Entry 14JU-14815 at 2; Jan. 29, 2015 Jgmt. Entry 14JU-14887 at 2.)  Despite publication service on all men stated to be fathers[3] of the children for whom a change of custody has been sought, M.H. did not appear at the January hearing.  (Jan. 15, 2015 Hearing Tr. at 3.)

{¶ 4}  At the second hearing, on February 4, 2015, the magistrate noted that this case was a refiled version of a prior case and that the original emergency removal actually took place in Summer 2014.  (Feb. 4, 2015 Hearing Tr. at 3-4, filed Oct. 30, 2017; s*ee also* FCCS Ex. No. 14, July 1, 2014 T.C. Order 14JU-8641; FCCS Ex. No. 16, July 1, 2014 T.C. Order 14JU-8641.)  M.H. also failed to appear for this hearing.  (Feb. 4, 2015 Hearing Tr.

---

[3] Our decision concerns Mk.H., D.H., and Mc.H. because they are the only children for which custody is at issue in this appeal.  However, the mother of Mk.H., D.H., and Mc.H. also had other children for whom her rights to continued custody were also being decided by the trial court.

in passim.) Later on the same day, the trial court adopted a case plan prepared by FCCS. (Feb. 5, 2015 Entry Adopting Case Plan 14JU-14815; Feb. 4, 2015 Case Plan 14JU-14815; Feb. 5, 2015 Entry Adopting Case Plan 14JU-14887; Feb. 4, 2015 Case Plan 14JU-14887.) The case plan required M.H. to obtain housing, obtain legal income sufficient to meet the basic needs of the children, complete domestic violence classes, complete parenting classes, establish paternity for all his children, sign releases of information for all service providers, and cooperate with announced or unannounced home visits at least every calendar month. (Feb. 4, 2015 Case Plan 14JU-14815 at 12; Feb. 4, 2015 Case Plan 14JU-14887 at 12.)

{¶ 5} Approximately one year after the complaints were filed, in October 2015, the children's mother filed pro se motions for custody. (Oct. 22, 2015 Mother Mot. for Custody 14JU-14815; Oct. 22, 2015 Mother Mot. for Custody 14JU-14887.) On motion of FCCS, the trial court, on October 28, 2015, extended the temporary custody order. (Oct. 28, 2015 Jgmt. Entry 14JU-14815; Oct. 28, 2015 Jgmt. Entry 14JU-14887.) Shortly thereafter, on November 16, 2015, FCCS moved for permanent custody. (Nov. 16, 2015 Mot. for P.C. 14JU-14815; Nov. 16, 2015 Mot. for P.C. 14JU-14887.)

{¶ 6} The children's mother failed to appear for the hearing on November 19, 2015 on her motions for custody and the motions were in consequence dismissed. (Nov. 19, 2015 Entry Dismissing Mot. 14JU-14815; Nov. 19, 2015 Entry Dismissing Mot. 14JU-14887; Nov. 17, 2015 Hearing Tr. at 3-4, filed Oct. 30, 2017.) M.H. also did not appear at that hearing. (Nov. 17, 2015 Hearing Tr. in passim.)

{¶ 7} At a hearing on February 25, 2016, the children's mother was present and was served with the permanent custody motions. (Feb. 25, 2016 Hearing Tr., filed Oct. 30, 2017.) M.H. again did not appear. *Id.* in passim.

{¶ 8} M.H. appeared in the case for the first time at a hearing on March 31, 2016, over one and one-half years after the initial removal of the children and several months (and two hearings) after the filing of motions for permanent custody. (Mar. 31, 2016 Hearing Tr. at 2, filed Oct. 30, 2017.) The attorney for FCCS indicated for the record that M.H. was served with the permanent custody motions. *Id.* at 3. M.H. appeared pro se at the March hearing but obtained an attorney shortly thereafter. *Id.* at 8-9; Apr. 5, 2016 Entry Appointing Counsel.

{¶ 9} Approximately one year later, the case came up for trial on the permanent custody motions. (Apr. 20, 2017 Tr., filed Oct. 31, 2017.) The children's mother did not oppose the motions and did not appear for the hearing. *Id.* at 10. M.H.'s attorney appeared to oppose the permanent custody motions of FCCS as to Mk.H., D.H., and Mc.H. *Id.* at 10-11. M.H. did not appear until one hour after proceedings had begun having mistaken the date. *Id.* at 10-11, 19. Although M.H. opposed the permanent custody motion of FCCS at trial and requested custody of the children in his written closing argument, in the nearly three-year life of the case, he never filed a motion for custody of the children. *Id.* at 10-11; May 15, 2017 M.H. Closing Brief at 1.

{¶ 10} During the course of the permanent custody hearing, three witnesses testified, M.H., John Bates (guardian ad litem for the children), and Mychal Featherstone (caseworker in charge of the case). The parties also stipulated to the admission of a number of exhibits including a psychological evaluation of M.H. (Stipulation 2, FCCS Ex. No. 2.)

{¶ 11} M.H. testified that he met the children's mother when he was in high school and dropped out in order to be with her. (Apr. 20, 2017 Tr. at 145-46.) In 2009, after fathering a child with her for the third time (but before Mc.H. was born) M.H. met his current wife and left his children and their mother behind. *Id.* at 147-51. After that point, M.H. admitted that his contact with Mk.H., D.H., and Mc.H. was less than regular and that he never paid child support. *Id.* at 34-36, 152-53, 179; Apr. 21, 2017 Tr. 186-89. His recollection was that (even before the 2014 emergency removal in this case) the children were in the custody of FCCS for approximately two years beginning in 2011. (Apr. 20, 2017 Tr. at 34-36.) Nonetheless, M.H. reported that he often saw them on Thursdays to get ice cream, sometimes watched them on the weekends, and that he visited them often during a time in which his mother served as a placement for the children. *Id.* at 152-53; Apr. 21, 2017 Tr. 186-89.

{¶ 12} M.H. admitted that he smoked marijuana and had smoked regularly since he was very young. (Apr. 20, 2017 Tr. at 56-59.) He denied current marijuana use on the first day of the hearing. *Id.* at 57-58. However, after agreeing to take a drug test and testing positive during the hearing, he was forced to admit that he had smoked recently after all and that he was finding it difficult to stop, having smoked for so long. *Id.* at 127-28; Apr. 21, 2017 Tr. at 284-85.

{¶ 13} In the course of M.H.'s testimony, FCCS introduced certified copies of court documents to the effect that M.H. was convicted of carrying a concealed weapon (a fourth-degree felony) and sentenced to community control. (Apr. 20, 2017 Tr. at 83-92; FCCS Ex. No. 18, Aug. 10, 2010 Jgmt. Entry.) The records introduced and partially read into the record also showed that M.H. was accused by the probation department of having failed multiple drug tests during 2011-2013 (for marijuana), that he stipulated to the violations, and that his community control was terminated unsuccessfully. (Apr. 20, 2017 Tr. at 90-92; FCCS Ex. No. 20, Apr. 4, 2014 Req. for Revocation; FCCS Ex. No. 19, May 6, 2014 Entry at 1.)

{¶ 14} M.H. admitted that he was accused (but not convicted) of domestic violence involving the mother of Mk.H., D.H., and Mc.H. (Apr. 20, 2017 Tr. at 98-99; Apr. 21, 2017 Tr. at 219-20.) He also admitted that he was convicted of domestic violence in another incident in which he allegedly punched his current wife in the face, splitting her eyebrow.[4] (Apr. 20, 2017 Tr. at 100-101; FCCS Ex. No. 21, Municipal Court Recs. 14CRB-2312.) He denied the incident and stated that he only pled guilty to get out of jail. (Apr. 20, 2017 Tr. at 100-01; FCCS Ex. No. 21.) But M.H. later testified that the violence did occur and he maintained that his activity in his church had kept him away from such trouble in the time since. (Apr. 21, 2017 Tr. at 250-52.) Certified copies of court records were admitted into evidence to substantiate the domestic violence incident. (FCCS Ex. No. 21.) M.H. also admitted that in 2013 he filed for divorce from his current wife but testified that he merely did it to get the reaction he wanted from his wife. (Apr. 20, 2017 Tr. at 102-05; FCCS Ex. No. 22, Jan. 24, 2013 Compl. 13DR-278.) Notwithstanding these incidents, M.H. testified that his relationship with his wife was perfect and that, as of the time of trial, he had the family life he had always wanted. (Apr. 21, 2017 Tr. at 250.)

{¶ 15} M.H. testified that his apartment was small, an "apartment for one, but it's a two bedroom," and that he shared it with his wife and the two children they had together. *Id.* at 231. He testified that he was employed and that he and his wife's combined income was approximately $2500 per month. (Apr. 20, 2017 Tr. at 111.) He explained that he had

---

[4] We note that the exhibit merely reports that M.H. "split[]" or "cut[]" "the eye open." (FCCS Ex. No. 21 at 3-4.) As M.H. was not accused of felonious assault (for more serious injury to the victim, such as to the eye, itself), we infer that eyebrow rather than eyeball was intended by the use of the phrase "splitting" or "cutting" "the eye open." *Id.*

tried to find better housing but failed due to budgetary constraints, his wife's eviction records, and his felony conviction. (Apr. 21, 2017 Tr. at 236-37.) Despite the fact that he previously admitted to having a suspended driver's license, he testified that he and his wife (who also did not have a valid driver's license) had been driving around looking for a larger place to live. *Id.* at 289-91; Apr. 20, 2017 Tr. at 111.

{¶ 16} M.H. agreed that the children might have special needs but was not aware of the extent of the abuse they had suffered and felt that they should not be medicated. (Apr. 20, 2017 Tr. at 108-09, 114-23.) He felt it was not important to talk to the children about who hurt them and that it was better to focus on the fact he loves them and they love him. *Id.* at 167-70. He explained it was his belief that all that was really wrong with the kids was that they were missing the loving foundation that he described only a biological parent can provide. *Id.* at 108-09, 112, 173-74.

{¶ 17} He admitted he never legally established paternity over Mc.H. (Apr. 21, 2016 Tr. at 268.) He also admitted that when the agency contacted him in 2015, he declined to become involved because last time FCCS became involved he was given the "run around" and the children were still returned to their mother. *Id.* at 278-79. M.H. testified that he never sought custody of the children during this case or during any of the prior involvement with FCCS because he did not have a great lawyer. *Id.* at 294-95.

{¶ 18} The caseworker, Mychal Featherstone, testified that she had been the caseworker for the children (and their three half-siblings who are not subjects of this appeal) since August 2015. (Apr. 20, 2017 Tr. at 223.) She confirmed that M.H. was legally the father of Mk.H. and D.H. but had never established legal paternity of Mc.H. *Id.* at 226-27. Featherstone testified (and the parties stipulated) that (with respect to this case) the children have all been in the custody of FCCS since July 1, 2014. *Id.* at 237-41.

{¶ 19} Featherstone testified that her first contact with M.H. was in 2015 when she called him. (Apr. 21, 2017 Tr. at 10.) She reported that he was abrasive on the telephone, agreed to a meeting with her, but then he failed to show up. *Id.* She did not have contact with him again until she called him in 2016 and arranged to meet. *Id.* at 10-11. During the meeting, he denied that domestic violence occurred between him and the children's mother and also denied drug use. *Id.* at 11. She asked him to complete a psychological exam and participate in drug testing. *Id.* He completed one drug screen on that occasion which came

back positive for marijuana. *Id.* at 12-13. Whereupon, M.H. admitted that he smoked marijuana, had done so for a long time, and was not sure he could quit. *Id.*

{¶ 20} Featherstone reported that all three of the children involved in this case suffer from Attention Deficit Hyperactivity Disorder ("ADHD") and Post-Traumatic Stress Disorder ("PTSD") and have Individualized Education Programs ("IEPs") at school. *Id.* at 38. She disagreed with M.H.'s contention that love is all that is needed to care for these children appropriately and expressed concerns about his ability and dedication to handle the children's needs on a long-term basis. *Id.* at 54-55. Specifically, she reported that FCCS gave M.H. resources to help him find a larger home suitable to having more children under his care, but that he failed to take advantage of them. *Id.* at 14-15. She also noted that M.H. never cooperated in a home visit, would fail to answer the door for even scheduled visits, and never returned calls or contacted her after she left her card following missed visits. *Id.* at 14-15, 84-85.

{¶ 21} Due to scheduling difficulties and M.H. missing one appointment, Featherstone said she did not receive M.H.'s psychological testing results until January 2017. *Id.* at 15-19. The psychological test showed good interactions between M.H. and the children on visits. (FCCS Ex. No. 2, M.H. Psych. Report at 11-12, 15; Apr. 21, 2017 Tr. at 85-91; *see also* Apr. 21, 2017 Tr. at 48-49.) However, the text evinced concerns about M.H.'s ability to parent under stress, his ability to cope with his children's PTSD, his capacity to provide a safe, stable environment, his drug use, and his criminal history. (Apr. 21, 2017 Tr. at 22-23, 91; FCCS Ex. No. 2). Featherstone testified that even during the several-month time between the release of the test results and the April trial, M.H. did not complete any of the recommendations that resulted from the psychological review or even meet with her to discuss the results, had flatly refused to stop smoking marijuana, and had failed to find a larger home to accommodate the three additional children. *Id.* at 65, 93, 115, 122-23. Featherstone concluded that, despite the fact that FCCS personnel (including her) visited M.H.'s home, despite the fact that notices relating to the case were routinely sent to M.H.'s proper address (and never returned), he had essentially failed to engage with FCCS. *Id.* at 22-24, 147-49.

{¶ 22} Featherstone reported that the children's foster mother has special training in how to address the needs of children with PTSD and ADHD and that the children are

managed well in the care of their foster family. *Id.* at 38-43. She testified that the children are thriving in the care of their foster parents, are bonded to both foster mother and father, and that the foster parents have expressed the desire to adopt the children if permitted to do so. *Id.* at 43-47. In light of that and her other testimony, Featherstone recommended that the permanent custody motion be granted. *Id.* at 63-64.

{¶ 23} John Bates, guardian ad litem for the children, testified that M.H. had done too little for his children too late. (Apr. 20, 2017 Tr. at 182, 201-02, 214-15, 220.) Specifically, M.H. had been unable to cease using marijuana, had not found larger accommodations despite several years in which to do so, had not responded to the guardian's attempt to visit, and had (other than being present for visits) essentially done nothing on the case plan. *Id.* at 202-03, 206-07, 214-15, 220. With specific regard to the marijuana, Bates testified that M.H.'s use, per se, was not the real problem. (Apr. 21, 2017 Tr. at 306.) The real problem was M.H.'s dishonesty about it, his lack of concern for court orders, and his demonstrated inability to conform to the law even for his children's sake. *Id.* at 306-07, 312-14. In that vein, Bates noted that M.H. admitted that he and his wife, neither of whom had driver's licenses, had been driving and that both M.H. and his wife had outstanding warrants for arrest (M.H., for driving on a suspended license, and his wife, for two counts of operating a vehicle while impaired (OVI) and for driving on a suspended license). *Id.* at 312-14; *see also* Apr. 20, 2017 Tr. at 132.

{¶ 24} Bates echoed Featherstone's sentiments about the foster family. He testified that the foster family had a large property in the country with a trampoline, bikes, dogs, and a big dining table around which the children gathered for meals as a family. (Apr. 20, 2017 Tr. at 189-91.) He confirmed that the foster parents were prepared to adopt the children. *Id.* at 201. He testified that all the children had expressed to him their wish to be adopted and understood what the concept meant. *Id.* at 191-92, 201. Bates reported that while none of them wanted to go back to their abusive mother, they had held out some hope for going to live with their father. *Id.* at 192. However, they seemed to understand that their father needed to make more of an effort to provide an appropriate living environment for them and, despite his expressed intentions, he was never going to do that. *Id.*

{¶ 25} Bates also recommended permanent custody be granted to FCCS. *Id.* at 201-02.

{¶ 26} On June 2, 2017, the trial court issued orders in case Nos. 14JU-14815 and 14JU-14887 granting the permanent custody motions as to all three children at issue in this appeal. (June 2, 2017 Jgmt. Entry 14JU-14815; June 2, 2017 Jgmt. Entry 14JU-14887.) In granting the permanent custody motions, the trial court several times remarked that it had not found M.H. to be a credible witness. (June 2, 2017 Jgmt. Entry 14JU-14815 at 10-11; June 2, 2017 Jgmt. Entry 14JU-14887 at 10-11.) It observed that M.H. "minimizes the special needs of the children because of his inadequacy to meet those needs and/or his unwillingness to do so." (June 2, 2017 Jgmt. Entry 14JU-14815 at 13; June 2, 2017 Jgmt. Entry 14JU-14887 at 13.) It opined:

> It is abundantly clear that Father lacks insight as to his Children's needs and his own shortcomings as an adequate parent. With the exception of maintaining supervised visitation with his Children, Father made no effort to complete any case plan objectives. His efforts to maintain supervised visitation only commenced subsequent to the filing of the motion for permanent custody.

(June 2, 2017 Jgmt. Entry 14JU-14815 at 11; *see also* June 2, 2017 Jgmt. Entry 14JU-14887 at 11.) The trial court summed up:

> [F]rom the day Father left the home of his children (before August 8, 2010) until the date of the hearing (April 20 and 21, 2017) Father has shown an unwillingness to provide an adequate permanent home for his children.

(June 2, 2017 Jgmt. Entry 14JU-14815 at 13; June 2, 2017 Jgmt. Entry 14JU-14887 at 13.)

{¶ 27} M.H. now appeals.

## II. ASSIGNMENT OF ERROR

{¶ 28} M.H. assigns a single error for review:

> Appellant was prejudicially deprived of his United States and Ohio constitutional rights to a fair trial due to the ineffective assistance of counsel.

## III. DISCUSSION

### A. Legal Standards to be Applied in Reviewing the Trial Court's Decision

{¶ 29} M.H. argues that his trial counsel was ineffective to a constitutionally deficient degree because she failed to object to several items of evidence that he now argues were excludable hearsay. (M.H.'s Brief at 7-15.) Before addressing each of the specific items

of alleged hearsay, we review the law of hearsay and ineffective assistance of counsel in permanent custody hearings.

{¶ 30} Juv.R. 34(I) provides that, unlike a typical dispositional hearing, the rules of evidence *are* applicable in permanent custody hearings. The Ohio Rules of Evidence generally define " 'Hearsay,' " as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Hearsay is generally not admissible. Evid.R. 802.

{¶ 31} Ineffective assistance of counsel claims are assessed using the two-pronged approach set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient. * * * Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. "In evaluating counsel's performance, 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ' " *State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 37, quoting *Strickland* at 689, quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955). " 'To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.' " *State v. Griffin*, 10th Dist. No. 10AP-902, 2011-Ohio-4250, ¶ 42, quoting *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. The failure to make either showing (deficient performance or prejudice) defeats a claim of ineffective assistance of counsel. *Bradley* at 143, quoting *Strickland* at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").

### B. Psychological Report

{¶ 32} M.H. first argues that counsel was ineffective in stipulating to the admissibility of M.H.'s psychological evaluation. (M.H.'s Brief at 8-9.) However, while the psychological report did contain damaging information, it also contained favorable observations about M.H.'s mental stability and about his good behavior during visits. *Compare* FCCS Ex. No. 2 at 11-15 *with id.* at 19. M.H.'s counsel used positive aspects of the

psychological report when cross-examining the guardian ad litem and caseworker. (Apr. 21, 2017 Tr. at 85-91, 309-10.) Under the circumstances, we cannot say that the decision to stipulate to the admissibility of the psychological report was so obviously a mistake as to overcome the strong presumption that counsel's decision amounted to sound trial strategy. *Roush* at ¶ 37.

### C. Documents Regarding M.H.'s Probation Violations

{¶ 33} M.H. next argues that his counsel was ineffective in failing to object on the basis of hearsay to the admission and use of records of M.H.'s probation violations. (M.H.'s Brief at 10.) Specifically, M.H.'s counsel failed to object to FCCS exhibit No. 20, a request for revocation in which M.H.'s probation officer alleged that M.H. had been convicted of domestic violence, had failed to report for a number of urine screens, and had tested positive for marijuana on nine occasions. (Apr. 20, 2017 Tr. at 90-91; FCCS Ex. No. 20.)

{¶ 34} The request for revocation meets the basic definition of hearsay. It is a written statement under Evid.R. 801(A) made by a declarant (the probation officer) outside the proceeding at bar and was offered to prove the truth of the matters asserted therein—in essence, that M.H. had indeed been convicted of domestic violence, had failed to report for a number of urine screens, and had tested positive for marijuana on nine occasions. Evid.R. 801(C); Apr. 20, 2017 Tr. at 90-91; FCCS Ex. No. 20. However, as M.H. stipulated to the violations of his probation sentence for his criminal conviction, the request for revocation was "a statement of which the party [M.H.] has manifested an adoption or belief in its truth" under Evid.R. 801(D)(2)(b). *See* FCCS Ex. No. 19 at 1. As such, it is not considered as hearsay notwithstanding the fact that it would otherwise meet the general definition. Evid.R. 801(D)(2)(b) (setting forth certain categories of evidence as "not hearsay"). Moreover, the request for revocation was a certified court record and therefore was a "public record" within the meaning of Evid.R. 803(8). And even if it had been hearsay, it would have constituted an exception to the general rule of exclusion under Evid.R. 802.

{¶ 35} An objection on hearsay grounds would not likely have been sustained, and, thus, we do not find that it was ineffective for counsel to have failed to object.

### D. Caseworker's Repetition of the Children's Mother's Statements

{¶ 36} M.H. argues that his counsel was ineffective in failing to object on hearsay grounds to statements made by the caseworker reporting things told to her by the mother of the children in this case. (M.H.'s Brief at 10-11.)

{¶ 37} In the first portion of testimony where this occurred, the caseworker related that she was "assessing" M.H. and was "confused" by the conflicting information she had been given by M.H. and by the mother of his children about whether there had been domestic violence in their relationship. (Apr. 21, 2017 Tr. at 11.) When asked to elaborate, the caseworker explained that M.H. had told her there was no domestic violence while the mother told her there was. She testified FCCS records showed there was a domestic violence charge against both M.H. and the mother but the charge against M.H. was dismissed. *Id.* at 11-12. The second instance where the allegedly objectionable testimony occurred was when the caseworker related the mother told her that M.H. had visited her to vent his feelings on occasions when he had arguments with his current wife. *Id.* at 152-54.

{¶ 38} Both M.H. and the mother are parties to the case, thus their own statements could be used against each of them as statements by a party opponent. Evid.R. 801(D)(2)(a). But, as M.H. asserts in his reply brief, the mother's statement seemed to be used against M.H. (M.H.'s Reply Brief at 4.) That removes it from exemption under Evid.R. 801(D)(2)(a) because it is not his own statement. *Id.* In short, while M.H.'s out-of-court statement could be used against him, the mother's statement could not and should not have been used against him.

{¶ 39} Yet, our reading of the transcript demonstrates that in each instance the statements of the mother did not appear to be introduced for the truth of what was asserted therein. Evid.R. 801(C). In the first instance, it appeared the caseworker was not attempting to state that domestic violence definitely occurred. Rather she appeared to be attempting to explain that she approached the case with conflicting information and therefore chose to be cautious and asked M.H. to get a psychological exam to "see what the recommendations say and go from [there]." (Apr. 21, 2017 Tr. at 11.) In the second instance, the caseworker did not seem to be introducing the mother's comments about M.H.'s supposed arguments with his wife to show that indeed such arguments occurred; rather, the point of the exchange seemed to be M.H. was continuing to have contact with the children's mother (who was dangerously mentally unstable) and this was a concern. *Id.*

at 151-52.  For example, when Featherstone was asked why she was concerned about what the mother told her, she related she knew M.H. and the mother were on cordial terms, but did not realize it was to the point that M.H. visited her in person.  *Id.*  This was noteworthy to the caseworker because M.H. had seemed unfazed by reports of the severe abuse the mother inflicted on the children and expressed substantiated concern if M.H. was given custody, he would allow the children to stay with their mother from time to time.  *Id.* at 51-53, 102-08.  In short, an objection to this testimony could have been overruled because the testimony was not offered for the truth of the matters asserted but rather to explain why the caseworker (whose testimony was subject to the trier of fact's judgment as to weight and credibility) believed M.H. should not be awarded custody of the children involved. We do not perceive these statements, used in this way, to be impermissible hearsay within the meaning of Evid.R. 801(C).  Thus, trial counsel could have intelligently made the decision not to tender an objection likely to be overruled.

{¶ 40}  We " 'must assess the reasonableness of the attorney[']s decisions at the time they are made, not at the time of our assessment.' "  *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995), quoting *State v. Wilkins*, 64 Ohio St.2d 382, 390 (1980).  "Debatable trial tactics generally do not constitute a deprivation of effective counsel." *Phillips* at 85, citing *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980).

### E.  Caseworker's Testimony Concerning Drug Screens

{¶ 41}  M.H. argues that his counsel rendered ineffective assistance when she failed to object and actually adopted the caseworker's testimony concerning the results of drug screens taken by M.H.  (M.H.'s Brief at 11, citing Apr. 21, 2017 Tr. at 12, 29, 97, 136-37, 243-44.)  While we agree that the test results were hearsay in the sense they were out-of-court assertions by a lab technician that were not directly introduced or testified to by the technician, we do not find the failure to object was ineffective assistance in this case.  *See* Evid.R. 801(C). M.H. admitted, before anyone else testified or before any drug screens were mentioned, that he was a marijuana smoker.  (Apr. 20, 2017 Tr. at 56-59.)  Initially, he attempted to deny ongoing use.  *Id.* at 59.  However, after agreeing to a mid-trial drug test and testing positive, he admitted that he had been a habitual smoker of marijuana for such a long time that he found it impossible to quit.  *Id.* at 127-30; Apr. 21, 2017 Tr. at 284-85. The fact that he took and failed drug tests during the life of the case, is merely cumulative of the admissions he already made, and, thus, even if those results might have been

excluded by a timely objection (which we expressly do not find), there is no reasonable probability the failure to object would have affected the result of this case. *Griffin* at ¶ 42.

### F. Mid-Trial Drug Screen

{¶ 42} M.H. urges we find his counsel was ineffective in failing to object to references to the results of a failed mid-trial drug screen. (M.H.'s Brief at 11-12.) However, M.H. (not his attorney) agreed he would take the drug screen after the guardian ad litem requested it. (Apr. 20, 2017 Tr. at 128.) Thus, if it was an error of strategy to have agreed to the drug screen, the error was M.H.'s, not his counsel's.

{¶ 43} The results of that test were mentioned by FCCS' counsel in a colloquy with the court and testified to by the caseworker on the second day of trial. (Apr. 21, 2017 Tr. at 97, 136-37.) While neither method of entering the evidence into the record was adequate or proper to introduce the results of the test taken by M.H., M.H.'s counsel's failure to object is entitled to a presumption that it was "sound trial strategy." *Roush* at ¶ 37; *Strickland* at 689. That is, counsel would likely have lost the objection and credibility before the trial court had she attempted to object to introducing the results of a test to which her client consented, especially given that M.H. admitted to being a habitual marijuana smoker. We do not consider it reasonably probable, had an objection been offered, the outcome of the case would have been different. *Griffin* at ¶ 42; *Strickland* at 694.

### G. Statements by Guardian ad Litem About M.H.'s Wife's Criminal Record

{¶ 44} M.H. requests that we find his counsel was ineffective in failing to object to statements by the guardian ad litem about M.H.'s wife's criminal record. (M.H.'s Brief at 13.) The guardian ad litem testified that he had learned that M.H.'s wife had three outstanding criminal warrants, two for OVI and one for driving on a suspended license. (Apr. 21, 2017 Tr. at 313.) Although M.H. argues that this was hearsay (and it may have been), the core problem is there was no questioning to establish a foundation for the guardian's knowledge. We recognize that without a foundation, it is not clear how the guardian knew about M.H.'s wife's outstanding warrants or whether he was qualified to testify to such matters and that trial counsel could have objected on that basis. However, we do not find any reasonable probability exists, had counsel objected, the outcome of the case would have been different. *See Griffin* at ¶ 42; *Strickland* at 694. Indeed, the most likely result of an objection here seems to be that opposing counsel would have retrenched, laid the proper foundation, encouraged the court to take judicial notice of dockets in those

other cases, obtained certified copies of the outstanding warrants, or taken some other action to properly and formally introduce the material.

### H. Cumulative Effect

{¶ 45} M.H. argues that the cumulative effect of the failures to object was constitutionally deficient representation and prejudiced M.H. to such a degree that there is a reasonable probability that the outcome of the case was affected. (M.H.'s Brief at 14-15.) We disagree. Even had counsel objected at all junctures M.H. argues were required, and even if those objections had been sustained, and even if, all evidence introduced explicitly complied with the rules of evidence or if not, was entirely excluded, the basic facts of the case remain unchanged. M.H. abandoned his children when two were very young and one was yet unborn. (Apr. 20, 2017 Tr. at 147-51.) He never paid child support. *Id.* at 179. He never obtained housing sufficient for five children and two adults. (Apr. 21, 2017 Tr. at 14-15.) He never established paternity of Mc.H. *Id.* at 268. He never engaged with FCCS or allowed the required monthly home inspections so that he could advance through the case plan process. *Id.* at 14-15, 22-24, 84-85, 147-49. He never sought custody of his children during multiple and multi-year cases with FCCS. (Apr. 20, 2017 Tr. at 10-11.) And he finally entered an appearance after years of disengagement, when FCCS at last filed a motion for permanent custody of the children. (Mar. 31, 2016 Hearing Tr. at 2.)

{¶ 46} We agree with the guardian ad litem's description that M.H. did "too little too late." (Apr. 20, 2017 Tr. at 201.) No testimony about his marijuana use or his wife's driving-related warrants impacts that basic truth, which is the core reason he is losing these children to the permanent custody of the State.

## IV. CONCLUSION

{¶ 47} We do not find that M.H.'s trial counsel rendered constitutionally ineffective assistance of counsel. We, therefore, overrule M.H.'s sole assignment of error and affirm the judgments of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgments affirmed.*

BROWN, P.J., and TYACK, J., concur.

––––––––––––––